# EXHIBIT C

## LICENSE AGREEMENT

This license agreement (hereinafter "Agreement") is made effective as of the ___ day of May, 2014 (hereinafter the "Effective Date") by and between: Martinson Industries, LLC, with an address at 27 Pearl Street, 4th Floor, Portland, ME 04101 (collectively "LICENSOR"), and PHALANX DEFENSE SYSTEMS, LLC ("LICENSEE"), a Florida Limited Liability Company, located at 4352 NE 40th Terrace, Gainesville, FL 32609.

WHEREAS, LICENSOR is the owner of certain unpatented and/or non-trademarked designs; and,

WHEREAS, LICENSEE desires to use and produce the designs in connection with the manufacture, sale and distribution of certain products designed by LICENSOR, as listed below, including all named and unnamed previous versions, designs, iterations or derivations thereof, and any and all post-prototype named or unnamed versions, designs, iterations or derivations thereof (hereinafter collectively the "PRODUCT(S)" or the "Licensed Design(s)", interchangeably), as set forth on the "Licensed Design Addendum", attached as exhibit "A" hereto;

NOW, THEREFORE, in consideration of the mutual promises and covenants herein contained, and other good and valuable consideration, the parties hereto agree as follows:

**Representations and Warranties**

A. LICENSOR represents and warrants that it is a Maine limited liability company in good standing, and that it is the sole owner of the product designs licensed to LICENSEE hereunder, or that LICENSOR is authorized by any and all entities and parties claiming an ownership interest in to and of the licensed product designs to execute this LICENSING agreement, and hereby agrees to hold harmless, indemnify and defend LICENSEE from any third party claims regarding ownership or rights to the licensed product designs which are subject to this agreement, as well as any claims based on infringement of existing PATENTS whether issued or PENDING, and MARKS perceived, potential, real, disputed or otherwise, and that it has taken all required actions to authorize the representative of the company signing this agreement to affix their signature hereto, for the company; and

B. LICENSEE represents and warrants that it is a Florida limited liability company in good standing, and that the company has taken all required actions to authorize the representative of the company signing this agreement to affix their signature hereto, for the company.

## 1. LICENSE GRANT
Subject to the terms, conditions, and restrictions of this Agreement, and conditioned on LICENSEE'S timely payment of all amounts payable hereunder, LICENSOR hereby grants to LICENSEE, an EXCULSIVE license to manufacture, produce, use, market and sell the design(s), during the TERM, within the TERRITORY, in each an every way LICENSEE sees fit, according to LICENSEE'S sole and exclusive discretion; including but not limited to producing or manufacturing products based on the licensed designs, sub-contracting the manufacturing of said products, distributing of said products, sublicensing said designs for production, manufacture or



EXHIBIT A
PAGE 1 OF 11

distribution. LICENSOR shall not permit production, distribution or manufacture of the design or designs under this agreement by any other manufacturer, distributor or producer.

## 2. TERRITORY
The TERRITORY is defined as WORLD WIDE, EXCEPT that exclusivity of distribution does not apply to the states of Vermont, New Hampshire, Maine, Rhode Island, Massachusetts, Connecticut, where LICENSOR shall retain the exclusive right to distribute the licensed products.

## 3. PERMITTED DISTRIBUTION CHANNELS
Permitted Distribution Channels shall not be limited.

## 4. TERM
The Agreement shall become effective on the date the last party hereto executes this Agreement, and shall continue in full force and effect until December 31, 2024, the "Expiration Date," (collectively, the TERM) at which time the Agreement shall terminate, unless LICENSEE elects its option to renew according to the terms contained herein, or the Agreement is sooner terminated as provided herein. LICENSEE shall be provided with a ninety (90) day sell-off period following expiration, provided that LICENSEE shall have performed all obligations required hereunder. Any such sell-off is royalty bearing.

## 5. MARKET INTRODUCTION:
LICENSEE shall make first offer for sale, "Market Introduction", no later than the end of the 2nd Quarter, 2014 (2Q14).

## 6. OWNERSHIP OF DESIGNS
As of the date of this agreement, LICENSOR has applied for a patent on the licensed design, and is awaiting disposition of that patent from the USPTO. In the event that said patent is not granted, LICENSOR does not and cannot represent that any protection via the use of traditional intellectual property rights is available. However, for the term of this agreement, subject only to the limited rights and licenses expressly granted to LICENSEE in this Agreement, insomuch as LICENSEE is concerned, LICENSOR shall retain all ownership rights in the designs and LICENSOR agrees that it will not do anything inconsistent with such ownership, such as failing to defend its ownership of the designs. All use of the Designs shall inure to the benefit of LICENSOR. Nothing in this Agreement shall be interpreted as giving LICENSEE any right, title, or interest in the Designs, other than the right to use the Designs, in accordance with this Agreement. LICENSEE further agrees that it will not challenge the validity of this Agreement or attack the title of LICENSOR to the Designs. No license or other interest of any kind in such proprietary rights is directly or indirectly granted to LICENSEE, except as specifically provided in the LICENSE GRANT above. LICENSEE further agrees to notify LICENSOR in writing of any violation or potential violation of LICENSOR'S proprietary rights, including trademark rights in the designs, of which LICENSEE becomes aware. All sample products provided by LICENSOR will be available for LICENSEE'S use.

## 7. NEWLY DEVELOPED WORKS
Any new designs, names, styles, colors, or other unique indicia of origin supplied to LICENSEE, created by LICENSOR, solely, and which is adopted *and* used by the LICENSEE in association

with the marketing and/or sales of the PRODUCT based on the licensed designs shall be the exclusive property of LICENSOR, and at the termination of this Agreement shall be turned over to LICENSOR for LICENSOR'S use, as LICENSOR sees fit, in its sole discretion. LICENSEE shall execute any and all documents or instruments that LICENSOR deems necessary or appropriate to assign and transfer to LICENSOR all ownership, right, title, and interest in and to newly developed works resulting from work of LICENSOR as described above. The LICENSOR's rights do not extend to new and unique creations or updates of PRODUCT or designs by or of LICENSEE, whether or not based on or incorporating the licensed designs.

## 8. QUALITY STANDARDS and SAMPLES

LICENSEE agrees that the nature and quality of PRODUCTS rendered by LICENSEE under the licensed designs and all related advertising and promotional uses of the designs shall conform to the standards set by LICENSOR. LICENSOR hereby obligates himself to be available to review the PRODUCTS produced by LICENSEE based on the licensed designs, and LICENSOR shall have a continuing obligation of inspection, according to mutually agreed upon production schedules, to be addressed between LICENSOR and LICENSEE at the commencement of production of the products. LICENSEE shall submit to LICENSOR a sample of each product based on the Licensed Design as well as a sample of the proposed marketing and packaging material for LICENSOR'S review, prior to distribution or use. Approval by LICENSOR shall not be unreasonably withheld. LICENSOR shall have the right to have LICENSOR'S name or brand represented on the packaging material for each product manufactured and distributed by LICENSEE or by LICENSEE'S contract manufacturer and/or distributor(s), based on licensed designs from LICNESOR, unless otherwise agreed in writing. Upon the commencement of sales, LICENSEE shall provide to LICENSOR the opportunity to inspect samples of the PRODUCTS covered by this Agreement at LICENSEE'S manufacturing and/or distribution location(s).

LICENSEE shall supply to LICENSOR additional units upon request at a price not to exceed LICENSEE'S normal cost to produce the item, including amounts which may, from time to time be allocated to insurance, labor, and other amortized costs incidental to manufacturing or production of the product, plus applicable handling and shipping, less any royalty that would have otherwise been due. LICENSOR shall not resell PRODUCT samples in circumvention of this agreement, including but not limited to: repackaging products in other than their original packaging from LICENSEE, selling at an "adjusted" wholesale price to a retailer or distributor other than those under appropriate contracts with LICENSEE, or selling products apart from this agreement by any means not specifically allowed by this agreement, except that LICENSOR shall have the right to continue selling the PRODUCT(S) based on the licensed designs and to sell the same at similar or same wholesale and retail price(s) as the products being sold by LICENSEE through its distributors or retailers. Specifically, LICENSOR shall be permitted to continue its existing business model and sales structure, subject only to the requirements of any anti-competition clause(s) within this agreement. However, LICENSEE cannot guarantee that its own marketing efforts will not intersect or compete within the same markets or market spaces, and the occurrence of competition of this nature shall not be considered a violation of this agreement. LICENSOR may use samples for other purposes including display at tradeshows, provided LICENSOR also includes the appropriate marketing materials of LICENSEE, so long as LICENSOR takes no action that could reasonably be inferred as circumventing this exclusive agreement. LICENSOR will be available to attend tradeshows on LICENSEE'S behalf, upon reasonable notice, and at LICENSEE'S expense.

## 9. FORM OF USE

LICENSEE agrees to use the licensed designs only in the form and manner and with appropriate legends as prescribed by LICENSOR. LICENSOR shall provide LICENSEE with all copyright and trademark legal notices that shall appear conspicuously on the PRODUCTS, packaging and any related promotional or advertising materials in connection with the PRODUCTS. If none of these notices are supplied by LICENSOR to LICENSEE, LICENSEE shall have the right, but not the obligation to pursue any intellectual property protection it deems necessary, subject to the understanding that such intellectual property shall become the property of LICENSOR upon the end of the TERM of this agreement. If this agreement is terminated by LICENSOR BEFORE the natural expiration of the initial term, the price for any intellectual property protection for the PRODUCT or licensed design procured by LICENSEE shall be negotiated at a fair market value, to be determined by an independent business evaluation of LICENSEE'S choosing.

## 10. ROYALTY RATE

The royalty rate shall be based on a sliding scale according to Net Sales. Net Sales shall be defined as LICENSEE'S gross, invoiced billing price to its customers or distributors, less any actual returns, markdowns, or credits issued in lieu of returns, and less any incidental charges including shipping, customs charges, or other handling charges associated with getting the order from one point to another. LICENSEE acknowledges that no other deductions from gross invoiced billing price shall be permitted. The sliding rate scale is based on the cumulative number of units sold, and shall be as follows: for units 1 through 2750, LICENSEE shall pay to LICENSOR a royalty at the rate of 15% of Net Sales as defined above; for units 2751 - 6000, LICENSEE shall pay to LICENSOR a royalty at the rate of 12.5% of Net Sales as defined above, and for all units sold above 6001 for the balance of the TERM of this agreement, LICENSEE shall pay to LICENSOR a royalty at the rate of 10% of Net Sales as defined above.

## 11. PAYMENT OF ROYALTIES

LICENSEE shall remit any royalty payments directly to LICENSOR. Royalties to LICENSOR shall be payable quarterly, in arrears, no later than thirty (30) days following the end of each calendar quarter, but at LICENSEE'S sole election, may be paid more often, such as monthly. At no time if LICENSEE elects to make payment of royalties on a monthly basis shall a monthly payment schedule become required thereafter. All royalty payments to LICENSOR shall be accompanied by a standard royalty report showing units shipped in the prior period, gross, and net sales (as defined above) and a statement of account showing all previous royalties paid. All payments shall be made by wire transfer or company check payable to LICENSOR, and shall be delivered to LICENSOR'S address as follows:

27 Pearl Street, 4th Floor
Portland ME 04101

Past due payments hereunder shall bear interest at the rate of (i) one point five percent (1.5%) per month, or (ii) the maximum interest rate permissible under law, whichever is less.

## 12. INSPECTIONS

LICENSOR shall have the right to transparency in accounting. Throughout the term of this agreement, LICENSOR may, at LICENSOR'S request, view LICENSEE'S sales records as related to any and all products licensed under this agreement. Additionally, throughout the TERM of this Agreement, and for a period of one (1) year thereafter, LICENSOR shall have the right, at LICENSOR's sole expense, and on reasonable notice during normal business hours, but not more frequently than once per calendar year, to have an independent accountant audit LICENSEE'S books and records with respect to the sale of PRODUCTS for the purpose of ensuring that all royalties due have been paid. If any examination of LICENSEE'S books and records reveals that LICENSEE has failed to properly account for and pay royalties owing to LICENSOR hereunder, by an amount in error greater than five percent (5%), then LICENSEE shall, in addition to paying LICENSOR such past due royalties plus interest, reimburse LICENSOR or its authorized representatives for their reasonable, direct, out-of-pocket expenses incurred in conducting such examination. Any royalty amounts not paid in error shall bear interest at the rate of one point five percent (1.5%) per month.

## 13. RENEWAL

LICENSEE, at its election, may elect an option to extend the TERM of this agreement by one term of FIFTEEN (15) years. LICENSEE'S election of this Option Term shall be made in writing, within 120 days of the expiration date of the initial TERM of this AGREEMENT, according to the Notice Provisions set forth herein.

## 14. TERMINATION

This Agreement may be terminated prior to the Expiration Date upon ninety (90) days notice from the terminating party. This Agreement may also be terminated upon either party's violation or failure to perform any material covenants of this Agreement. Upon written notice of such violation or failure to perform from the non-breaching party, the breaching party shall have thirty (30) days after receipt of such notice to cure any breach or default, or produce evidence indicating that no such breach has occurred. Upon failure to do so, the non-breaching party may immediately terminate this Agreement upon written notice to the other party stating that the Agreement has been terminated. In the event that LICENSEE ceases operations, files a petition in bankruptcy, becomes insolvent, or makes an assignment for the benefit of creditors, the license hereby granted shall automatically terminate forthwith, and without any notice whatsoever being necessary.

## 15. EFFECT OF TERMINATION

Upon termination of this Agreement, LICENSEE agrees to discontinue all use of any protected design, licensed under this agreement, and either destroy or deliver to LICENSOR all remaining materials based on the protected, licensed design, following a "Sell-Off Period" of ninety (90) days.

## 16. INVENTORY OF PRODUCTS ON TERMINATION:

Any PRODUCTS that may have been manufactured by or for LICENSEE prior to the Expiration Date or which were in the process of manufacture by or for LICENSEE, or were required to fill purchase orders from customers accepted by LICENSEE on or prior to date of termination, may be sold by LICENSEE during the "Sell-Off Period" (which for these purposes shall mean a period of ninety (90) days immediately following the Expiration Date or Agreement termination date, or the date upon

which the last existing purchase order or fulfillment obligation has been satisfied whichever is later), provided that:

    a)     LICENSEE is not in default of any material term or condition of this Agreement;

    b)     the quantity of such PRODUCTS in inventory at the time of such termination is not in excess of a reasonable quantity taking into account LICENSEE sales requirements for open and existing orders, sales of the PRODUCTS for the previous quarter, or a comparable 90 days of the prior year, or a combination thereof, whichever is greater;

    c)     LICENSEE shall furnish to LICENSOR, within thirty (30) days after the effective date of the termination of the Agreement, a written statement of the number and description of such PRODUCTS in inventory as of the effective date of termination;

    d)     LICENSEE shall continue to pay to LICENSOR, with respect to such sales, all earned royalties at the rate or rates specified herein; and

    e)     earned royalty amounts payable pursuant to this paragraph shall be paid within thirty (30) days following the end of said Sell-Off Period.

## 17. BEST EFFORTS

This Agreement shall continue in full force and effect for the TERM as long as LICENSEE uses commercially reasonable efforts to manufacture, market, distribute, and sell PRODUCTS using the licensed designs. LICENSEE agrees that, during the TERM and throughout the TERRITORY, LICENSEE will not "dump" any PRODUCTS anywhere and shall use its best efforts to sell each of the PRODUCTS at a price, which, in its reasonable, good faith business judgment, represents the best attainable price from its costumer for such PRODUCTS. Termination of the remaining TERM, plus reasonable attorney's fees and costs paid to enforce LICENSOR's right of Termination shall be LICENSOR's sole remedy for any such failure of LICENSEE to use commercially reasonable efforts, provided that LICENSEE has not dumped any PRODUCTS as described herein.

## 18. MARKETING EFFORTS.

During the TERM, LICENSEE agrees to expend its own resources for trade and consumer advertising, marketing or promoting the PRODUCTS Licensed hereunder. For these purposes, trade and consumer advertising, marketing or promotion shall mean advertisements, brochures, sales sheets, trade shows, trade ads, catalogs and similar marketing materials published and distributed to consumers, and in publications intended for consumers, or broadcast through radio or other media, that are designed and intended to promote the sale of PRODUCTS, including point-of-purchase displays for use by retailers and promotional pieces provided to retailers for use in sales promotion to consumers (including the creative costs of developing such advertisements and other materials as well as the placement costs of the publication, broadcast and distribution of those consumer advertisements) or trade show and showroom displays or any and all other promotional activity or materials created and developed by or on behalf of

LICENSEE to be used to promote the distribution and sale of PRODUCTS to the trade. Within thirty (30) days following the last day of the first full calendar year of operation under this agreement, and at the close of each calendar year thereafter, LICENSEE shall submit to LICENSOR a report setting forth the amount and nature of such expenditures by LICENSEE, which are applicable to the relevant period.

### 19. NOTICES AND SUBMISSIONS:
A) All notices or submissions to be made or delivered by LICENSEE to LICENSOR pursuant to this agreement shall, until or unless changed by notification delivered to LICENSEE, be delivered to the address of LICENSOR as follows:

Martinson Industries, LLC
27 Pearl Street, 4th Floor
Portland, ME 04101

All such materials shall be delivered to LICENSOR free of charges such as shipping charges or customs charges. In the event that any such charges are paid by LICENSOR, LICENSEE agrees to make prompt reimbursement.

B) All notices or submissions to be made or delivered by LICENSOR to LICENSEE pursuant to this agreement shall, until or unless changed by notification delivered to LICENSOR, be delivered to the address of LICENSEE as follows, by Certified Mail, Return Receipt Requested:

> Phalanx Defense Systems, LLC
> c/o Justin M. Mowitz, Esq.
> 4352 NE 40th Terrace,
> Gainesville, FL 32609

All such materials shall be delivered to LICENSEE free of charges such as shipping charges or customs charges. In the event that any such charges are paid by LICENSEE, LICENSOR agrees to make prompt reimbursement.

### 20. INDEMNIFICATION
A) LICENSEE agrees to hold harmless, defend, and indemnify LICENSOR and its respective officers, employees and agents, provided LICENSOR notifies LICENSEE promptly in writing of the action (and all prior claims relating to such action) and LICENSEE has control of the defense and negotiations for its settlement:

(i) against any and all third party claims (whether actual or threatened and whether justified or not) limited to the PRODUCTS and their manufacture, packaging, distribution, promotion, marketing, sale, or exploitation and claims of product liability; and

(ii) against any and all third party claims related to the breach or alleged breach of any of LICENSEE's representations and agreements set forth herein; and related damages, costs and expenses (including but not limited to reasonable attorney fees and costs).

LICENSEE shall have the right to defend any such action or proceeding with counsel of its own choice. This indemnification shall continue beyond the termination or expiration of this Agreement, only to the extent that the stated manufacturer's warranty for products sold under license granted hereunder continues in full force and effect.

B) LICENSOR agrees to hold harmless, defend and indemnify LICENSEE and its respective officers, employees and agents, provided LICENSEE notifies LICENSOR promptly in writing of the action (and all prior claims relating to such action) and LICENSOR has control of the defense and negotiations for its settlement:

    (i) against any and all third party claims (whether actual or threatened and whether justified or not) related to the use of the Licensed design; and

    (ii) against any and all third party claims related to the breach or alleged breach of any of LICENSOR's representations and agreements set forth herein; and damages, costs and expenses related thereto (including but not limited to reasonable attorney fees and costs).

LICENSOR shall have the right to defend any such action or proceeding with counsel of its own choice. This indemnification shall continue beyond the termination or expiration of this Agreement.

Should either party breach its obligation to hold harmless, defend or indemnify the other party as set forth above, the non-breaching party has the right to elect, without limiting or otherwise affecting any other rights available to it at law or in equity, the remedy of Specific Performance, or to terminate this agreement immediately upon the breaching party's failure to defend.

## 21. PRODUCT LIABILITY INSURANCE:

LICENSEE agrees to provide and maintain in effect, at its own expense, throughout the duration of the TERM, product liability insurance, as follows:

    a) The insurance shall, be written by a company providing a rating of "A" or better or by such other company consented to in writing by LICENSOR. The policy of insurance will provide, inter alia, for (30) days advance notice to the LICENSOR and LICENSEE of any proposed modification or cancellation. Upon any modification and/or cancellation of any insurance policy required hereby, and prior to the effective date hereof, LICENSEE shall deliver replacement insurance to the LICENSOR.

    b) The self-insured retention on all of the insurance policies above shall be no more than U.S. $50,000 (Fifty Thousand U.S. Dollars) in the aggregate and no more than U.S. $25,000 (Twenty Five Thousand U.S. Dollars) per claim, and the limit of liability of such insurance shall be no less than One Million US Dollars (US $1,000,000) for any claim arising out of a single occurrence and at least Two Million US Dollars (US $2,000,000) for all claims in the aggregate.

    c) All insurance policies required to be maintained shall be primary and shall not require contribution from any coverage maintained by the LICENSOR, and shall

        not contain, without the LICENSOR's written consent, any special or non-customary exclusions.

   d)   LICENSEE shall submit to LICENSOR a fully paid policy or certificate of insurance naming LICENSOR and LICENSOR's authorized agents, as additional insured parties.

   e)   LICENSEE understands that the LICENSOR's rights and the LICENSEE's obligations shall not be limited or affected by the provisions of this section.

## 22. ASSIGNMENT:
This agreement shall bind and inure to the benefit of LICENSOR, and the successors, heirs and assigns of LICENSOR. The rights granted LICENSEE hereunder shall not, except as otherwise stated herein, without the prior written consent of LICENSOR, be transferred or assigned to any other entity, except as otherwise permitted herein, or in such case as LICENSEE has transferred or assigned all or substantially all of its assets to an organization situated in the same or similar market place, which will continue to market the PRODUCTS or licensed designs hereunder.

## 23. SUBLICENSING:
LICENSEE shall have the right to sublicense or subcontract to any entity any right or portion thereof licensed to it hereunder without further approval of LICENSOR.

## 24. SIGNIFICANCE OF HEADINGS:
Section headings contained herein are solely for the purpose of aiding in speedy location of subject matter and are not in any sense to be given weight in the construction of this agreement. Accordingly, in case of any question with respect to the construction of this agreement, it is to be construed as though such section headings had been omitted.

## 25. ENTIRE AGREEMENT:
This writing constitutes the entire agreement between the parties hereto and may not be changed or modified except by a separate writing, signed by both parties.

## 26. JOINT VENTURE:
This agreement does not constitute and shall not be construed as constituting a partnership or joint venture between LICENSOR and LICENSEE. Neither party shall have any right to obligate or bind the other party in any manner whatsoever, and nothing herein contained shall give, or is intended to give, any rights of any kind to any third person.

## 27. RESERVATION OF RIGHTS:
All rights not herein specifically reserved by LICENSOR shall remain the property of LICENSEE to be used in any manner LICENSEE deems appropriate.

## 28. LIMITATION OF LIABILITY:
LICENSEE's sole remedy against LICENSOR for loss or damage arising out of the performance or non-performance by LICENSOR under this agreement will be limited to direct, actual damages incurred by LICENSEE. LICENSOR will not be liable for any indirect, punitive, special or consequential damages arising out of its performance or non-performance under this agreement, whether or not LICENSOR has been advised of the possibility of such damages. In

addition to LICENSOR'S right of termination, LICENSOR's sole remedy against LICENSEE for loss or damage arising out of the performance or non-performance by LICENSOR under this agreement will be limited to direct, actual damages incurred by LICENSOR. LICENSEE will not be liable for any indirect, punitive, special or consequential damages arising out of its performance or non-performance under this agreement, whether or not LICENSEE has been advised of the possibility of such damages.

## 29. EXECUTION AND DELIVERY REQUIRED:
This instrument shall not be considered to be an agreement or contract, nor shall it create any obligation whatsoever on the part of LICENSOR and LICENSEE, or either of them, unless and until it has been signed by a representative of LICENSOR and by a representative of LICENSEE and delivery has been made of a fully executed original. This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute one in the same instrument.

## 30. INTERPRETATION OF THE AGREEMENT:
This Agreement shall be governed by and interpreted according to the laws of the United States of America and the laws of the State of Florida, where applicable, without reference to conflict of law principles. If any provision in this Agreement shall be found or be held invalid or unenforceable in any jurisdiction in which this Agreement is being performed, then the meaning of the provision shall be construed, to the extent feasible, so as to render the provision enforceable, and if no feasible interpretation would save the provision, it shall be severed from the remainder of this Agreement, which shall remain in full force and effect. The terms and conditions herein constitute the entire Agreement between the parties and supersede all previous agreements and understandings, whether oral or written, between the parties hereto with respect to the subject matter of this Agreement. Venue for any dispute arising under this agreement shall exclusively lie with a court of competent jurisdiction in Gainesville, Alachua County, Florida.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be signed below by their respective duly authorized officers or representatives.

Agreed:

Martinson Industries, LLC
(LICENSOR)

By: _____

Printed Name: Robert Desroriers

Title: Manager

Date: 5/5/2014

Phalanx Defense Systems, LLC
(LICENSEE)

By: _____

Printed Name: Justin M. Mowitz, Esq.

Title: COO, General Counsel

Date: _____

Exhibit "A"
LICENSED DESIGN ADDENDUM

1. "ELSA – Emergency Life Saving Armor"; "Hard Armor in a Bag" system, or any other name, description or identifying convention related to the product known as "ELSA" as applied to the products which occupy the civilian, law enforcement, non-law enforcement first responder and military market segments, for body armor products, only.